May I begin? You may. Good morning, may it please the court, my name is Ben Goss. I'm here on behalf of Robin Thomas. When a claimant, your honor, in an ERISA-governed long-term disability insurance case has her claim denied, ERISA promises her a fundamental, ERISA promises her what they call a full and fair review. And there are two parts to a full and fair review. The first is a denial letter that fairly speaks of the reasons why we are denying your claim. And second, access to the pertinent documents that we, the insurance company, relied upon to deny your claim. I think the big issue in this case, your honor, is the refusal of Aetna to provide the claim file to my client when she asked for it. But I want to touch for a moment on the denial letter, because I think it sets up this bigger problem. If you look at the initial denial letter in this case, it lists really one reason why we're denying your claim. You'll recall that this lady was on, you've been a car accident, was on short-term disability benefits for about four and a half months. Aetna was managing that. Gets near the end of that term, they terminate her short-term benefits. And because she had applied for long-term, they deny. You see, your claim for long-term benefits is denied. And here's the reason. It really lists one reason. The reason is two conversations. So conversations that we, the insurance company, have had with two of your health care providers. And Mr. Holmquist is referred to as a doctor in the denial letter. He's not. He's a physical therapist. And a doctor knew him. So in that first denial letter, there's a mention of medical records, but there's no analysis. There's nothing that says, we looked at all these tests. They're all negative. We don't think that you followed up with your treating doctors. There's none of that. But when you look at the final denial letter, which is at the end of the period, there's about 10 brand new reasons, mainly based upon an analysis of the medical records, that didn't appear in the first denial. So that's a fundamental violation of ERISA. Because this whole scheme, the ERISA scheme, is designed so that a claimant and an insurance company, which is almost always an insurance company, can have an opportunity to participate in a meaningful dialogue. I sent you my records. You denied my claim. Why? Oh, let me go fill in the holes. Let me try to overcome the reasons. So as a first matter, that initial denial letter fails. And we know that it fails because there's 10 reasons in the second one. And there's four more reasons in the brief. And that is brief in this court, which aren't even in either of the two denial letters. Now, you could almost forgive or get around or accommodate for the failed denial letter. Because in every case, a claimant asks for a claim file. And it's routine. The claim file is provided. I haven't had a policy that said, once you tell us that you want to appeal your claim, we're not going to give you the claim file. And I'll tell you that claim file is always full of nuggets and information that, again, what we're talking about here is allowing the claimant to participate and have a meaningful dialogue with the insurance company. So as you know, the day after Edna told her that they were initially denying her long-term disability claim, she says, I'd like to appeal that. Yesterday, this court issued its published opinion in SHUIP, which is a long-term disability case. And in SHUIP, the court uses the phrase, what the claimant did is asking. It begins asking for the process of a full and fair review of the claim. Edna had this policy that said, we're not going to give it to you, at all. And that claim file had information, a lot of information in it. It was rich with information that she could have used to provide herself new information for Edna. Principally, you'll recall that her claim was, she'd been T-boned in a car accident, she had six prior neck surgeries, she had a lot of head and neck pain, and she complained of cognitive dysfunction. So dizziness, forgetfulness, inability to string sentences together, things like that. It's not in the initial denial letter, but in the claim file, we see the report from one of the Edna specialists, Dr. Siegel, one of the Edna reviewers, who says, I see all these complaints, I see they're noted through the medical records, but they're only subjective. There's no objective evidence of them, like a neuropsychological evaluation. And a neuropsychological evaluation, as you probably know, is testing which, in my words, makes objective things like an inability to word find, have short and long-term memory, think logically, things like that. So it's clear that Edna violated in two ways. One, the bad original denial letter, and two, in saying, no, that's our policy, you can't have the claim file. So the real question is, did that matter? Because if you go all the way back to, there's a case called Ellis versus Metropolitan Life. So there's two cases that I think are important for this case. One is Gagliano from 2008, the other is Ellis versus Metropolitan Life. There's a third case, this court's unpublished opinion two years ago, in a case called Odle, which also dealt with the risk. And in Odle, there was an audit, it was a pension case, there was an audit the claimant was looking for. The administrator said, no, you can't have it. And this court asked, well, so what difference would it have made? And that's the question that gets asked here. Well, if she had the claim file, what difference would it have made? Well, we know this. One year after her accident, after this claim is closed, she does get neuropsychological evaluation, and she does have testing. And that testing found profound disturbances in her cognitive ability. It found that she scored below 50% in a number of cognitive areas. So had they either said in the initial denial letter, look, there's no objective evidence of a cognitive disorder, or had they given my client the claim file that she can now look at and go, oh, this reviewer is looking at this and saying there's no neuropsych here, let me go get a neuropsych. There's very strong evidence, because we know it was like one year post-accident, very strong evidence that it would have mattered. And you and I, this court in Ben Glass, shouldn't be here debating, well, the quality of the evidence was one better than the other. That's what ERISA, in providing for meaningful dialogue at the claim level, that's where that discussion should take place. So, she was denied her full and fair review because the denial letter was bad, they didn't give her the claim file, Aetna doubled down on its brief, didn't say this is a mistake. This is Aetna policy that I'm here to correct, and what I'm asking the court to do is to remand the case to the with instruction to remand the case to Aetna and give her her full and fair review. In other words, to restart her appeal process. And we will be able to now address all of the issues Aetna raises in their second denial letter and all the additional issues that they raise in their brief. There's this new information now, because she has this neuropsych, which was too late for the claim because she didn't know, and she's got a social security disability award. So, Aetna should look at all of that information and we should have the opportunity. What I'm asking for is the opportunity to be able to take this information back to Aetna and give her what ERISA guarantees her, which is a full and fair review. I take it you don't allow fishing expeditions, there has to be a causal connection. And correct me if I'm wrong, there is a causal connection between the ultimate denial of the claim documents and its failure to provide the relevant documents as absent the information in the file. What's in that file that you know now is related to their failure to give you those documents? Well, there's a couple things. So first, there's the 10 specific new reasons in the second denial letter that she's never been able to address. For example, some of those are, we looked at the record and it appears that you did not accept a surgery, a trigeminal neuralgia surgery that one of your physicians was recommending. Now, I don't know if that's a good reason or a bad reason, but that's in the claim file and she should be able to say, well, you know what, I've had six prior neck surgeries and Dr. Nguyen tells me there's other treatment available to me. So that's an example. But the biggest example I would point to, Judge Floyd, is the neuropsychological evaluation that was done February one year post-accident, because it strongly shows that she had significant cognitive dysfunction. And again, my argument is that if she had seen in the claim file that a key argument that the reviewer is using is the lack of a neuropsych evaluation, then she would have at least had the opportunity to go and get one. And I should be allowed, and she should be free to argue, that it's likely that a neuropsych done earlier than one year post-accident also would have showed, would have given objective evidence of significant cognitive dysfunction. Remember, she had a pretty high-end job working for Booz Allen. She worked with numbers and spreadsheets and met with teams and worked with a number of screens all the time. And from the beginning of the claim, her principal complaint was, I can't think straight. And her employer said, you can't come back to work until you are 100 percent. Because Edna had an argument that she could go back to work for some accommodations, which really involved, I think, putting a neck brace on and looking at various screens. Anyway, does that answer your question? Because I think that is the most significant point I would make, the subsequent neuropsych, as to why it actually shouldn't be that an insurance company is allowed to have policy that says we can say no. Because I tell you, that will encourage this sort of activity. I think Gagliano will answer that question. Well, I think he does. I think Gagliano, Ellis, and you won't find a case in the country that says you're allowed to have that policy and that you're allowed to just say no. So I think the I don't understand. Ben Glass doesn't understand why Edna doubles down on this argument and didn't just give her another review. But the question is, you know, would it have mattered? And I'll say this finally, and then I'll sit down, is the bar for her, for Robin Thomas, should not be high to show. Because what are we aiming for? We're aiming for an opportunity for a meaningful review, for a meaningful dialogue, is what the cases including this court have said, a discussion, so that we make these claims efficient. These people don't have to go get lawyers. They don't drive up the time and the expense of getting a claim resolved. That's the balance. You know, ERISA gives these insurance companies a discretionary standard of review, and that tilts the playing field. But ERISA then takes its regulations to try to balance that tilting of playing field as best it can by saying, here's the file. And it's the only type of litigation, I do a lot of tort litigation, the only type of litigation where you get the entire insurance company claim file, and they have to give it to you, and they have to give it to you for free as soon as you ask for it. And I'll tell you that routinely, routinely, client comes in, have a denied claim, we send the letter, in 30 days we have a claim file. So I'll sit down unless the court has any other questions about this. Thank you. Thank you. Mr. Downey. So good morning, your honors. Brian Downey and Troutman Pepper Hamilton Sanders on behalf of Aetna Life Insurance Company. The primary issue before this court is really whether Aetna abused its discretion when it determined that Robin Thomas was not entitled to long-term disability benefits, that she had not established her entitlement to those benefits. And as Judge Hilton appropriately found, that decision was correct. It was neither arbitrary nor capricious. Instead, it was the result of a principled and reasoned analysis. And the Aetna determined that she was not disabled from the, that she had been disabled initially, because there is no question of disability. Mr. Downey, you know, obviously you can argue the case where you want, but oral argument is for, to answer our question, at least right now mine. But you said, it's not really a question right now. Is it whether Aetna was correct and had a sound reason for denying it? Isn't the threshold questions whether or not Ms. Thomas had an opportunity to have a fair and meaningful opportunity to address those issues before you made that final decision? So can you, can you address that and see me? That's the core of the case right now. Can you address that, please? Absolutely, Your Honor. And the answer is she did. So there's a, here's the issue that I think gets obscured through this discussion, which is there's a lot of talk about her, the lack of the fact that she didn't have a neuropsychological evaluation and why is that significant? The underlying question behind that though is why didn't she have a neuropsychological evaluation? The answer is obvious because her treating neurologist did not think she needed it. And the reason her treating neurologist did not think she needed one is if you look at Dr. Crutchfield's records over and over and over, what Ben said, sorry, what Mr. Glass said, that she says, I suffer from certain I suffer from an inability to speak. He examines her and his answer is no, she doesn't. She has good short-term memory, good long-term memory, is fluent in speech patterns, has a good fund of knowledge and has no cognitive limitation that he identifies. And when he identifies the limitations, which she would certainly have some, some accommodations that would need to be made for her or would have been made for her, when he identified those accommodations, they were all physical. He did not identify any neurocognitive limitation. So the record before Aetna is that according to her own physicians, she doesn't need that. The reviewer mentions in passing that she hasn't had that, which is true as you would always look at in any case where someone is asserting a disability, when her physicians are saying that her condition is much better than she is. And so you see it in a mental health cases all the time. We're still not addressing my question because you're going into the merits of your decision, which is fair enough. When you get to that aspect of it right now, the question is whether or not she had a fair opportunity to address your, for your sake of argument, very sound reasons. So fair enough. Sorry. And your Honor, I started down that road and I sidetracked myself. I apologize. Let me get back onto it. The answer is yes. So the July 31, 2017, that is the initial denial. And what it does is, as required by the 2000, the then applicable 2002 regulations, it provides a specific reasons for the adverse determination and references her to the pertinent plan provisions. So it summarizes the applicable policy provisions, which is what is required to do. It explains the process of record review. It explains that there was an independent clinical review. So prior to appealing and prior to making the decision not to request a claim file before starting her appeal, she knew this existed. The idea that she was surprised or didn't know anything about it is just not true. And then of course it goes through the communications with the providers. So it has identified that she is not disabled, that the medical evidence does not support that she's disabled. It then tells her she has 180 days to submit an appeal. Of course, she's not required to appeal, number one. That's her choice. But if she wants to, she has 180 days to do that. And it identified some areas of information that she could submit. She could get a copy of the record if she wanted them. And she's not required to do any of it. But what she opted to do was to appeal immediately. Was she informed that if she opted to appeal, that that right to get her file would be cut off? No, Your Honor. And if you think about what Alice provides as law, what's the point under the Alice jurisprudence about this? The point of giving her a claim file is so that she can prepare the appeal. She's already done that. Now, Mr. Glass might regret how she did it. She might regret how she did it. But she did it. And it's not the role of a claim administrator to step in either and interfere with her decision and say, no, no, you shouldn't appeal. You should do something differently. Or as is even suggested here, interfere with her treatment to step in and say, you should be looking and you should be trying to get a doctor to get you this kind of testing, even though your treating physician doesn't think you need it. Well, I think we have a little bit of a problem. It's simpler than say she was told that Aetna does not release claim information, quote, once a review is in process. That is contrary to Gagliano and to Alyssa. They're entitled to that material. So why wasn't she entitled to it? Why was she told no? Because there's an appeal in process. So that they could process the appeal. They have the record. They're most of the way through it, actually, initially, other than they ended up now needing an additional review at the end. But that's the reason, Your Honor. Do I wish they hadn't done it? I don't think they were legally required to do it, but I wish they had because we wouldn't be here today on this issue. But she had it. I'm sorry, Your Honor. Isn't that issue the heart of the appeal? Well, I understand that's what the plaintiff, the appellant is trying to make it. I don't think it really should be because I don't think it's the issue that the appellant has, that it has the legs the appellant does, but thinks it has. But if you're telling me it's the heart of the appeal, then I think I would defer to you on that. And then, of course, what happens? Why does she ask for the claim? She asks for it because she learns that there is a record, that there's a report that has been generated on appeal that she wants. That's the trigger. And under the then applicable regulations, she was not entitled to get it. Now, the answer, if that happened today, the regulations have changed. So if she called today and said, I even want the IMR report, she would get it or she wouldn't even have to call. It would have automatically been sent to her. But that just was not true at that time. And so when she got, what Ellis talks about is why do you get the appeal? You get the appeal so that you, I'm sorry, why do you get the record? You get the record so you can prepare the appeal. She did that. She could have done any number of things. She could have waited to appeal. She could, she talked about how she had a lawyer. She could have had her lawyer. But she opted not to do any of those things. And I think we're on dangerous ground when we start to say that a claim administrator is now somehow supposed to manage that. As opposed to do what it's supposed to, which is once she files that appeal, the clock is running. How do you equate responding by giving her the documents to managing? I mean, I don't know if one has seen the first or the foremost to give the documents. The latter would be actually to like, for example, sorry, you're not going to say, well, it looks in here. I see the holes here and therefore you need to shore up this, shore up that. That would be managing. But to simply give those documents a plain file, that wouldn't be management on the, on Edna's part, would it? Not if she had asked at the beginning. Of course not, Your Honor. They should have given it to her. They would have had she asked for it. She did. She opted not to do that. So the management piece that now is being imposed is this argument that Edna, instead of going through the normal appeal process, perhaps should have said to her, well, why don't you wait 180 days? Why don't you get a lawyer? Why don't you review the whole record? Why don't you ask us for things that you don't have? It's not the claim administrator's responsibility to do that. It's her right to ask for it prior to the appeal. She didn't, her right to hold the appeal, her right to get all those things. And Edna said, once we were in process, because we're working with this right now, we're in the middle of this, trying to administer your claim under specific ERISA guidelines that we have to comply with. We don't send out a copy. We'll send it to you at the end. And that's what she got. She got one later. And the idea that it mattered, of course, we do know that after the denial, even though her doctor had not seen the need for a neuropsychological evaluation after the denial, she eventually got one. She got something, which turned out not even to be reliable, which again, not surprising. I mean, it happens. But so that it would not have made any difference in the end. Now I can talk about the case itself, but my sense is that it might be better if you had specific questions about the case itself, meaning the claim itself as opposed to the regulatory issue. And I'm happy to do that. But I'm also, if there are questions about that, I'm happy to do that and answer them. Or if you feel you don't need anything further on the merits of the decision itself, I'm happy to stop. All right. Thank you so much, Mr. Downey. Mr. Glass, you have some time reserved. Briefly, and thank you very much. So we're not asking anyone to manage a claim. We're asking them to hit the print and send button. My friend on the other side raised the question, well, how come none of her doctors ordered a neuropsych before this? That's a question that needs to be can be answered. I have an answer for that. Happy to share it with you. But the point is, that's an answer that's a question that needs to be tussled with during the appeal process. And the appeal process, it's important to remember, and I think that we all here do, is that it's not like an appeal to this court, where you've got a closed record and you file your notice of appeal, and now we're working. In these aristic cases, an appeal sets off an insurance companies get IMEs, SHUP got an FCE, and sometimes insurance companies say during the appeal process, we want to send you to our doctor to go get a neuropsychological evaluation. So that's all part of the process. My friend says, well, the neuropsych that she gets a year later isn't valid. Well, I think that's medical nonsense, and I should have an opportunity to address what my experts would say is medical nonsense, that that neuropsych is somehow not valid. And she didn't have a lawyer. I mean, look, she didn't have a lawyer when she gets the letter and she calls her claim rep and says, I want to appeal. And as a layperson, again, these regulations are get lawyers to have benefits of sometimes between $1,500 and $4,500 a month. And so we're not spending years and years doing this. It's meant to balance the playing field. So again, unless the court has any questions, I think this is a remand to Judge Hilton, again, with instructions to remand the case to the claim administrator. And either at the end of the SHUP opinion, the court mentions attorney fees and says, in that case, that question should go back to the district court for the first time. And I know this court has done it a different way. So just, if I win, I'd like to apply for attorney fees and just leave it to this court to tell me whether it's my application here or in the district court when it goes back to Judge Hilton, unless the court has any other questions. I'm good. Thank you, Mr. Glass, Mr. Downing, for your arguments. Again, as I said before, that we wish we could come down and greet you in our normal fashion, but we cannot under the circumstances. But please know, nonetheless, we appreciate your being here. And thank you so much for your arguments. Be safe and stay well.
judges: Roger L. Gregory, Henry F. Floyd, William B. Traxler Jr.